IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| THE PENN MUTUAL LIFE INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiff, |
| v. |
| PATRICIA CAMILLY, et al., |
| Defendants. |

CASE NO. 1:18 CV 460

JUDGE DONALD C. NUGENT

<u>MEMORANDUM OPINION</u>

This matter is before the Court on cross motions for Summary Judgment filed by Defendants Patricia Camilly and Wells Fargo Bank, N.A. ("Wells Fargo"). (ECF # 48, 83). Both motions have been fully briefed and are ready for disposition. (ECF # 94, 95, 97, 98).[1] Having reviewed the undisputed facts and applicable law, and having considered the arguments of the parties, the Court finds that Ms. Camilly's Motion for Summary Judgment should be DENIED,

---

[1] Ms. Camilly filed a Motion to strike Defendant Wells Fargo Bank N.A.'s Memorandum in Opposition to Motion for Summary Judgment as untimely. (ECF #96). That motion is denied. Wells Fargo's Opposition contains substantially the same information and arguments as does its Motion for Summary Judgment. (ECF #95, 83). Further, the Court's opinion does not rely on any of the attachments to the Opposition which were not part of Wells Fargo's Motion for Summary Judgment. Therefore, Ms. Camilly was in no way prejudiced by the allegedly late filing of the Opposition, and there is no reason to strike that filing.

and Wells Fargo's Motion for Summary Judgment should be GRANTED in part and DENIED in part.

## Procedural History/Facts[2]

The Penn Mutual Life Insurance Company filed a Complaint in Interpleader to resolve competing claims for the proceeds of a life insurance policy that insured the life of Robert Howlett, who passed away on September 15, 2017. The policy provides a total death benefit in the amount of $1,750,467.20, plus accrued and accruing interest and earnings. Wells Fargo is named as the sole owner and beneficiary of the policy. Ms. Camilly, however, claims that she is entitled to all proceeds of the policy pursuant to the terms of a Separation Agreement ("Separation Agreement") she entered into with Mr. Howlett. That agreement was adopted by the Medina County Court of Common Pleas as part of their Decree of Divorce in April of 2014.

With regard to insurance, the Separation Agreement provided that Ms. Camilly be designated the sole and primary beneficiary of Mr. Howlett's Primerica Life insurance policy, number 0430762390; that ownership of that policy be transferred to Ms. Camilly; and, that Mr. Howlett continue to pay the premiums on that Primerica policy. (ECF # 48-2, Ex. A, §II G). There is no dispute that Mr. Howlett abided by all of these requirements, and that Ms. Camilly received the full benefit of this policy, in the amount of $225,000.00, upon his death.

The Separation Agreement further acknowledged that Mr. Howlett was also insured by

---

[2] Except as otherwise cited, the factual summary is based on the parties' statements of fact. Those material facts which are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to the non-moving party.

the Penn Mutual Life Insurance Company, policy no. 8 152 180, and recognized that this policy "assigns to Dan Schindler an amount sufficient to satisfy [Mr. Howlett's] outstanding obligation for the purchase of The Swedish Solution, Inc.," a business that Mr. Howlett purchased from Mr. Schindler.[3] Along with acknowledging the priority of the assignment to Mr. Schindler, the Separation Agreement required that Mr. Howlett "shall take any and all steps necessary to designate [Ms. Camilly] as the remainder beneficiary of said policy and following any divorce or other termination of the parties' marriage shall redesignate [Ms. Camilly] as the remainder beneficiary of said policy." (ECF # 48-2, Ex. A, §II G). There is no evidence that Mr. Howlett ever named or, following the divorce, redesignated Ms. Camilly as the residual beneficiary of the Penn Mutual Life Insurance policy, as the Separation Agreement required.

The paragraph immediately following this provision, states as follows:

> In the event of [Mr. Howlett's] demise prior to satisfying his obligations hereunder, the net proceeds of any life insurance policy set forth herein shall be used to satisfy his obligations hereunder. In the event the Husband satisfies his obligations hereunder, he shall no longer be obligated to make the premium payments on said policy(s), and [Ms. Camilly] may continue to do so if she chooses. At no time shall [Mr. Howlett] be required to maintain insurance on his life in an aggregate death benefit amount in excess of his total obligation to [Ms. Camilly] hereunder of $1500.00 per month for 120 months, or as reduced by the payments he makes upon said obligation.

(ECF # 48-2, Ex. A, §II G).[4]

---

[3] The assignment was given as collateral to secure payment of a promissory note in the amount of $1,521,000.00. At the time Mr. Howlett sold the policy to Magna Life Settlements, the outstanding obligation on the promissory note had been reduced to $583,004.33. Mr. Schindler was paid the full amount of the outstanding debt from the proceeds of the sale the Penn Mutual policy.

[4] The parties agree that the $1500.00 per month for 120 months, referenced in the third paragraph of the insurance clause of the Separation Agreement, refers to Mr. Howlett's

-3-

Except as provided above, both parties released each other from any and all rights each had or may have had "[a]s beneficiary in any trust or in any life or other type of insurance policy issued to the other." (ECF #48-2, Ex. A, §XI). Further they agreed that "neither party shall interfere with the use, ownership or disposition of any property now owned or hereafter acquired by the other." (ECF #48-2, Ex. A, §I). (ECF #48-2, Ex. A, §I).

On or about December 18, 2015, Mr. Howlett was diagnosed with Glioblastome Multiforme, a type of brain cancer. On May 20, 2016, he married Wendy Clawson. (ECF #98, Ex. J, pg. 7). In June of 2017, he applied to sell the Penn Mutual policy to Magna Life Settlements for $1,280,000.00, by way of a viatical agreement. Magna Life agreed to the sale and then assigned its rights in the policy to Wells Fargo. On August 4, 2017, Mr. Howlett changed the beneficiary and owner of the Penn Mutual policy to Wells Fargo, as Securities Intermediary. (ECF #48-2, Ex. B, C).[5] As part of this transaction, Mr. Howlett paid off his obligations to Mr.

---

obligation to provide spousal support to Ms. Camilly beginning on January 1, 2023, in compensation for her marital interest in Mr. Howlett's ownership of the Swedish Solution, Inc.. The total spousal support in the amount of $1500.00 per month for 120 consecutive months, or $180,000.00 was based upon the assumption that Mr. Howlett would complete the purchase of the business, Swedish Solution from Dan Schindler on January 1, 2023, and his income would, therefore, increase significantly at that time. (ECF #48-2, Ex. A, §III). . (ECF #48-2, Ex. A, §III). The spousal support provision also states that this provision "shall not terminate upon the remarriage of the wife or the death of either party, and as such, any unsatisfied portion thereof shall be includible in [Mr. Howlett's] estate (in the event that [he] predeceases [Ms. Camilly]) as an obligation to Ms. Camilly. . . ." The divorce court retained jurisdiction over the issue of spousal support "in the event that future circumstances are substantially different than as contemplated" in the agreement. (ECF #48-2, Ex. A, §III; see also ECF #48-2, Ex. A, §XV).

5

The parties disagree as to whether this change in ownership and beneficiary technically occurred on August 4, 2017, or should be considered part of the June 2017 transaction. In any event, there is no dispute that the change was contemplated and required under the

Schindler for the purchase of the Swedish Solution, Inc.. Ms. Camilly claims that Mr. Howlett was not competent to enter into the viatical sales agreement, or to agree to the accompanying change in beneficiary on the Penn Mutual policy.

Mr. Howlett passed away on September 15, 2017. Following Mr. Howlett's death, Penn Mutual received competing claims for the proceeds of the life insurance policy from Wells Fargo and Ms. Camilly. Penn Mutual filed a Complaint for Interpleader and deposited the funds with this Court pending resolution of these claims. During discovery, Dan Schindler, the prior owner of the Swedish Solution, and, originally, the primary beneficiary of the Penn Mutual policy, by way of an assignment, discovered that Ms. Camilly was seeking to invalidate the viatical sale. Because invalidation of the policy could conceivably result in a dispute over whether Mr. Schindler could keep the pay off he received from the proceeds of the sale, and because he had an assignment right to proceeds of the pre-sale policy, Mr. Schindler filed a Motion to Intervene, which the Court granted. (ECF # 79, 86).

## **Summary Judgment Standard**

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

---

terms of the sale, which was initiated in June.

together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. However, if the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-

mover. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible. The Sixth Circuit has concurred with the Ninth Circuit that "'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'" *Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). FED. R. CIV. P. 56(e) also has certain, more specific requirements:

> [Rule 56(e)] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit. Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

*Wiley*, 20 F.3d at 225-26 (citations omitted). However, evidence not meeting this standard may be considered by the district court unless the opposing party affirmatively raises the issue of the defect.

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are

> deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.

*Id.* at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249. The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## Analysis

### I. Obligations Under the Separation Agreement/Divorce Decree

#### A. Maintaining Insurance

The contract is clear that Mr. Howlett was legally obligated to name Ms. Camilly as the residual beneficiary of the Penn Mutual policy upon the signing of the Separation Agreement, and to re-designate her as residual beneficiary after the divorce was completed. Although there is no evidence to suggest that Mr. Howlett ever fulfilled this obligation, the Ohio Supreme Court has made clear that when a requirement to name an individual beneficiary of a life insurance policy is

made part of a separation agreement within a divorce decree, that beneficiary designation should be enforced through a judicially created constructive trust. *See, e.g., Kelly v. Medical Life Ins. Co.*, 31 Ohio St. 3d 130, 509 N.E.2d 411(1987). The resulting constructive trust must, however, limit the beneficiary's interest to the amount and purpose articulated within the separation agreement. *Id.* at 413. In this case, Ms. Camilly's interest was limited to proceeds remaining after Mr. Schindler's assignment rights were paid off, an amount which varied over time, but at the time of Mr. Howlett's death approximated $1,167,462.67.[6]

The Separation Agreement is equally clear, however, that Mr. Howlett had no obligation, at any time, to maintain insurance on his life in an aggregate death benefit amount in excess of his total obligation to Ms. Camilly. This means that he had no obligation to maintain the Penn Mutual policy so long as he otherwise maintained at least $180,000.00 in aggregate life insurance benefits for the benefit of Ms. Camilly.[7] In order to give meaning to both of these the terms, which are plainly articulated in the Separation Agreement, it can only be read to mean that Mr. Howlett was not specifically required under the Separation Agreement to maintain the Penn Mutual Policy, but, so long as he did, Ms. Camilly was to be the beneficiary of the policy and receive whatever

---

[6]
The policy, at the time of Mr. Howlett's death was $1,750,467.20, plus accrued and accruing interest and earnings. The remaining amount owed to Mr. Schindler at the time of the policy's sale was $583,004.33. This was the amount he would have received under the assignment if the policy had remained intact. This would leave a remainder amount of approximately $1,167,462.87 that would represent Ms. Camilly's interest under a constructive trust imposed by operation of the Separation Agreement. In her Motion for Summary Judgment, Ms. Camilly is seeking the full value of the policy.

[7]
The Separation Agreement provides that Mr. Howlett is required to maintain insurance only in an amount sufficient to cover his future financial obligations to Ms. Camilly, which amount to $1500/month for 120 months beginning in 2023. This equals a total future payment obligation of $180,000.00.

benefits remained after Mr. Schindler received what he was due under the assignment.

At the time he sold the Penn Mutual policy, and up until his death, Mr. Howlett honored his obligation to maintain at least $180,000.00 in life insurance through his maintenance of the $225,000.00 Primerica Life Insurance policy. The Agreement provided that in the event of his death prior to satisfying his future financial obligations, "the net proceeds of *any* life insurance policy set forth herein shall be used to satisfy his obligations hereunder." (Emphasis added).[8] There is no dispute that Ms. Camilly received $225,000.00 from the Primerica policy and that this amount exceeded the amount of Mr. Howlett's future support obligations under the Separation Agreement. Therefore, Mr. Howlett satisfied his obligations under the Separation Agreement to maintain coverage in an amount sufficient to cover his future payment obligations and was not required to maintain the Penn Mutual policy or any additional insurance under the terms of that Agreement.

### B. Option to Continue Payments

Ms. Camilly argues that even if Mr. Howlett were permitted to stop payments on the Penn Mutual policy, he was required under the Separation Agreement to give her the option of continuing payments and maintaining the insurance at her own cost. Therefore, she contends that he was not at liberty to sell the policy without first offering her the chance to take on the payments.[9] She bases this argument on the following provision: "[i]n the event [Mr. Howlett] satisfies his

---

[8] The Separation Agreement specifically required Mr. Howlett to transfer ownership of the Primerica policy to Ms. Camilly, and that he continue making the payments on it until his future financial obligations to Ms. Camilly were satisfied. The Agreement contained no such requirements for the on-going maintenance of the Penn Mutual policy.

[9] When Mr. Howlett informed Ms. Camilly prior to his death that he was considering selling

-10-

obligations hereunder, he shall no longer be obligated to make the premium payments on said policy(s), and [Ms. Camilly] may continue to do so if she chooses."

The literal terms of the Agreement do not support Ms. Camilly's position. Ohio law requires that the Agreement "be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." *Aetna Life Ins. Co. v. Hussey*, 63 Ohio St. 3d 640, 644-45, 590 N.E.2d 724, 728 (1992). Reading the plain language of the Separation Agreement, Ms. Camilly's option to choose to continue payments on one or the other of the mentioned insurance policies does not take effect until after Mr. Howlett's obligations under the Agreement have been satisfied. The parties agree that the obligations referenced are Mr. Howlett's future obligations to pay spousal support in to the total amount of $180,000.00. These obligations were not satisfied at the time of his death. Therefore, Ms. Camilly's ability to make a choice to continue payments on the Penn Mutual policy was never triggered.

The Separation Agreement does not estop or otherwise prohibit Mr. Howlett from selling the Penn Mutual policy. Nor does it give Ms. Camilly any right to buy out, take over, or otherwise benefit from that policy in the event Mr. Howlett chose to sell it, or otherwise failed to maintain it prior to satisfying obligations under the Separation Agreement.[10] Therefore, the sale of the Penn Mutual policy to Magna Life/Wells Fargo did not violate the Separation Agreement, and, if the sale was valid, Ms. Camilly is not entitled to recover any benefits from the Penn Mutual policy.

---

the Penn Mutual policy, and ending his maintenance of the policy. She did not consent to the sale, but also did not express any interest in taking over the premium payments.

10

This is true so long as Mr. Howlett continued to carry at least $180,000.00 in other life insurance, which he did; and, so long as he had not satisfied his future support obligations, which he had not.

## II. Competency

Ms. Camilly also argues that even if the Separation Agreement did not preclude Mr. Howlett from selling the Penn Mutual policy, the transaction should, nonetheless, be invalidated because Mr. Howlett was not competent to enter into a contract at the time of the sale. Wells Fargo argues that Ms. Camilly has no standing to challenge the validity of the viatical sale, because she was not a party to, or a beneficiary of, the transaction. Wells Fargo also contends that Mr. Howlett was competent to enter into the sales agreement at the time of the transaction.

### A. Standing

Prior to the viatical sale, Ms. Howlett, by operation of the Separation Agreement, was legally required to have been named the remainder beneficiary of the policy. As such, she would have had a right to any proceeds, in excess of the amount assigned to Mr. Schindler, so long as Mr. Howlett maintained the policy. If the viatical sale transaction were to be voided on the basis of Mr. Howlett's alleged lack of competency, the policy would revert back to Mr. Howlett's ownership and Ms. Camilly's beneficiary status would be reinstated. She, therefore, has a legal interest in determining the validity of the viatical agreement, which is sufficient to bestow standing in this matter.

### B. Mental Capacity

The test for mental capacity to enter into a contract is whether the person understood the nature of the transaction and the effects of his own actions. *Giurbino v Giurbino*, 89 Ohio App. 3d 646, 658 (Ohio Ct. App, 8th Dist. 1993) *(*citing *Ford v. Bachman* (App. 1938), 26 Ohio Law Abs. 620, 11 O.O. 475, 32 N.E.2d 511). Actions which alter the beneficiary of an annuity or life insurance policy are contractual acts that are similar, in effect, to the naming of an heir in a will.

*Flowers* at 621 (citations omitted). Therefore, the test for competency to enter into such acts can also be considered under the test for testamentary capacity. *Id.* A person's testamentary capacity is determined by whether the person "has sufficient mind and memory to (1) understand the nature of the business in which he is engaged, (2) to comprehend generally the nature and extent of his property, (3) to hold in his mind the names and identity of those who have natural claims upon his bounty, and (4) to be able to appreciate his relation to the members of his family." *Giurbino* at 65 8; see also, *Niemes v. Niemes*, 97 Ohio St. 145, 119 N.E. 503 (1917). Testamentary capacity can be proven by evidence of a person's mental and physical condition a reasonable time before and/or at the time of the testamentary act. *Flowers v. Siefer*, 88 N.E.3d 599, 618 (Ohio Ct. App. 6th Dist. 2017).

To prove a contract is voidable on the ground that a party lacked the mental capacity to enter into it, the complaining party must establish the lack of mental capacity by clear and convincing evidence. *Cameron v. State Teachers Retirement Bd.*, 10th Dist. Franklin No. 00AP-425, 2000 WL 1753116, *4 (Nov. 30, 2000)). (Nov. 30, 2000)(citing *DiPietro v. DiPietro* (1983), 10 Ohio App.3d 44); *Giurbino v Giurbino*, 89 Ohio App. 3d 646 (Ohio Ct. App, 8th Dist. 1993). There is also a rebuttable presumption that a person is competent unless they have been legally declared mentally incompetent. *Flowers* at 621, (citing *Cameron*, 10th Dist. Franklin No. 00AP-425, 2000 WL 1753116, *4). A lay person may be allowed to testify regarding a person's mental state. *Flowers* at 619 (citing *Rucker v. State*, 119 Ohio St. 189, 199, 162 N.E. 802 (1928)). Further, a physician's expert opinion on the mental competency of a patient is admissible, but not "necessarily conclusive as a matter of law." *Flowers* at 619 (quoting *Vetter v. Hampton*, 54 Ohio St.2d 227, 230, 375 N.E.2d 804 (1978).

In support of her argument that Mr. Howlett was not competent to execute the viatical sale agreement, Ms. Camilly cites hospital notes from June 14, 2017, one week before the viatical agreement was signed by Mr. Howlett. Those notes state, in part, that Mr. Howlett was not able to state his wife's name, and responded "77" when asked by the Dr. to state the date.[11] The notes also indicated that Mr. Howlett's wife expressed concern a week prior that he was having 'significantly more problems with his speech, difficulty getting his words out, not able to identify numbers on a cell phone. . . ." (ECF # 94, Ex A, pg. 1). The same report, however, went on to state that "[a]fter starting dexamethasone," at the time of the hospital visit, Mr. Howlett's speech "is significantly improved, although not quite back to what it was before." *Id.* The report also indicated that during that exam Mr. Howlett was "alert, understands what is said to him" and "was able to name our president." It further noted that he was also able to follow "all the commands well," and that he "cares for self." (ECF # 94, Ex. A, pg. 2).

Ms. Camilly also cites the deposition of Mr. Howlett's long time friend, Matthew Step. Mr. Step testified that around May of 2017, Mr. Howlett's condition was "[p]oor. Sometimes he was with it, and then there were other times he was not at all. It was like a deer in the headlights." He also stated that during a car trip in May of 2017, approximately a month before he sold the Penn Mutual policy, Mr. Howlett would "daze off kind of," "I don't mean physically, but sometimes he would fall asleep. Similar to that time in his life, sometimes I could have a conversation with him, but five minutes was – about five, ten minutes is about as much attention

---

[11] It was not apparent from the notes included in the evidentiary exhibits who the author of the notes was, or who performed the examination, though they do appear to be notes from Mr. Howlett's records of treatment at the Cleveland Clinic.

span as you could get. And I think ten would be pushing it." (ECF # 94, Ex. B, pg. 9-10). In late August or early September of 2017, approximately two months after he signed the viatical sale agreement, and within a month of his passing, Mr. Step described Mr. Howlett as "out of it," meaning he has a "blank stare on his face, watching a cooking show," which was out of character for him. Yet, Mr. Step indicated that, even at this time, Mr. Howell still "knew enough of what was going on around him at least to express his happiness of who he was around." (ECF # 94, Ex. B, pg. 24-25).

Mr. Step also testified, however, that Mr. Howlett had told him that "there was a possibility of buying out" the Penn Mutual policy on May 11, 2017, more than a month before he signed the agreement.[12] (ECF # 94, Ex. B, pp. 6-7). The conversation he had with Mr. Step was described as "very short" and "vague to the point he couldn't explain it." (ECF # 94, Ex. B, pg. 29-30). However, Mr. Step testified that at that time, Mr. Howlett knew and was able to communicate that the transaction would his current wife, Wendy to get the money, as well as allowing his to pay off Dan Schindler. Mr. Step testified that during May of 2017, Mr. Howlett was sometimes "with it, and then there were other times he was not at all," but that he could hold a conversation for five to ten minutes. (ECF # 94, Ex. B, pg. 9)

Finally, Ms. Camilly points to the testimony of Mr. Howlett's daughter, Stephanie Saxe. Mrs. Saxe is a nurse with experience in neurology, neurosurgery, and stroke care. (ECF #94, Ex. C, pp. 7, 12). She testified that from 2015 until his death Mr. Howlett exhibited an "inability to write, inability to form words or find words." (ECF # 94, Ex. C pg 17). Around January of 2016,

---

[12] Mr. Step did indicate that during this conversation Mr. Howlett "got lost in his own words."

she observed that he "had a hard time" communicating, experiencing "word salad, which is mixing up words, [and] garbled speech, loss of words," and that "couldn't think of what the words were that he wanted." (ECF # 94, Ex. C, pg. 18). Beginning at the time of his surgery in December of 2015 she stated that Mr. Howlett appeared to her to be confused and frustrated, that he couldn't tell her what year it was or who people were, and he did not recognize his granddaughter.[13]

Mrs. Saxe also testified that Mr. Howlett "could not verbalize a majority of the time, a word here, a word there, but it was garbled always." (ECF #94, Ex. C, pg. 22). Speaking as his daughter, she does not believe that his communication was "efficient, effective or understandable," or that he understood what she was saying "most of the time." (ECF #94, Ex. C, pg. 23). He could shake his head yes or no, "less than the majority" of the time. (ECF #94, Ex. C, pg. 23-24). Specifically in June of 2017, Mrs. Saxe testified that her father was "not able to talk" to her and was distant, and in August appeared mute and unable to participate in a conversation with her. (ECF #94, Ex. C, pg. 30, 34).[14] She testified that if medical personnel indicated that her

---

[13] His granddaughter was born just before his diagnosis and he had met her when she was born, but did not appear to know who she was at various times following his diagnosis. (ECF #, Ex. C, pg. 20-21). There is no allegation that he failed to recognize any other family members, any of his friends or business associates, or anyone who would have benefitted or otherwise been affected by the decision to sell the Penn Mutual policy.

[14] There is evidence that Mrs. Saxe's relationship with her father, or at least with her father's wife Wendy and her family, was significantly strained. Mrs. Saxe testified she had multiple disputes with Mr. Howlett's eventual wife, Wendy regarding his care, and had at least one altercation wherein she used expletives and called Wendy a "horrible person" and the "B word," in front of her father. (ECF #94, Ex. C, pp. 44-48, 57). She also testified that she was not "allowed to go" to their wedding, and was, in fact, threatened to stay away. (ECF #94, Ex. C, pp. 49-53). She threatened to try to get guardianship of her father, but never went through with actually applying to do so. (ECF #94, Ex. C, pp. 52-54).

father was lucid, alert, or oriented as to person, place and time, she would disagree "based on [her] opportunities." (ECF #94, Ex. C, pg. 55).

Wells Fargo, on the other hand, has provided evidence of Mr. Howlett's competency in the form of affidavits, deposition testimony from the individuals present at the viatical sale transaction, medical records, an affidavit from his wife, and declarations of competency from Mr. Howlett's treating physician during the relevant time period. Keith Lichtscien, the viatical sales broker testified that he had detailed discussions with Mr. Howlett at the time of the transaction, and weeks prior, in which Mr. Howlett articulated why he wanted to enter in the sale,[15] and questioned the process and how to maximize his gain. Mr. Lichtscien stated that Mr. Howlett was raising "high level thinking questions," and that he understood the process and the expected results of the transaction. (ECF #98, Ex. B). Several witnesses present during the transaction provided affidavits saying Mr. Howlett appeared to understand the proceedings, and that they had no reason to be concerned that he was not fully competent to understand and engage in the transaction. (ECF #98, Ex. C, D, E, F).

Mr. Howlett's primary care physician also provided two letters attesting to Mr. Howlett's competency. In May of 2017, Dr. Coviello opined that Mr. Howlett was "of sound mind,

---

[15] Specifically Mr. Howlett told Mr. Lichtscien that he needed cash to pay off Mr. Schindler in order to save the Swedish Solutions, Inc. business. Because of his illness, he had periods of time when he had not been able to work and the business was not bringing in enough for him to make his payments to Mr. Schindler. There was, therefore, in his mind, a threat that Mr. Schindler could foreclose on the business and he would lose it entirely. It was important to him that the business remain following his death and he was looking at the viatical sale as a way to pay off Mr. Schindler and ensure that the business would continue running after he passed away. He also needed money to pay expenses and bills. (ECF #98, Ex. B).

competent to handle his [] own business affairs, under no constraint or undue influence." Again in July of 2017, he provided a letter of competency on Mr. Howlett's behalf. (ECF # 98, Ex. I) In early August of 2017, his treatment notes also indicated that Mr. Howlett was experiencing "no confusion" and was "oriented to person, place and time." (ECF # 98, Ex. G, I).

Although neither of the witnesses referenced by Ms. Camilly were present when Mr. Howlett signed the viatical agreement, evidence of competency within a reasonable time period of the transaction is generally considered to be relevant and admissible. Further, the lay testimony of Mr. Step and Mrs. Saxe can be considered as evidence of Mr. Howlett's mental state. *See, Flowers* at 619. Although Mr. Howlett's physician provided two letters of competency, neither attested to his condition on the day of the transaction at issue, and although clearly admissible as evidence, the physician's expert opinion is not "necessarily conclusive as a matter of law." *Id.* Although Wells Fargo has presented a greater volume of evidence in support of its position on Mr. Howlett's competency, a determination as to the credibility and weight of the evidence is an issue better left for trial. Ms. Camilly has presented sufficient evidence to at least raise a question of fact as to Mr. Howlett's competency to enter into the viatical sale agreement, and summary judgment on this issue is, therefore, not warranted.

Mr. Schindler's Motion to Strike Ms. Camilly's Memorandum in Reply to Wells Fargo Bank's Opposition to her Motion for Summary Judgment is denied. A challenge to the validity of Ms. Camilly's claim is not grounds to strike her filing. The Court has, however, recognized that her request to receive "all of the proceeds" of the Penn Mutual Policy may not valid because her beneficiary designation in the Separation Agreement was limited to being a "remainder" beneficiary after Mr. Schindler's assignment rights under the policy were satisfied. The question

of whether Mr. Schindler's assignment rights would be reinstated if the viatical sale is voided, and what the value, if any, the value of the assignment may have been at the time of Mr. Howlett's death remain open questions that would have to be determined if a jury finds that Mr. Howlett was not competent to enter into the viatical sales transaction. This is why Mr. Schindler has been allowed to intervene in the litigation.

### Conclusion

For the reasons set forth above, both Ms. Camilly's Motion for Summary Judgment (ECF #48) is DENIED, and Wells Fargo's Motion for Summary Judgment (ECF # 83) is GRANTED in part and DENIED in part. The Motion to strike Wells Fargo's Opposition is DENIED, (ECF #96); and, the Motion to strike filed by Intervenor Daniel Schindler is also DENIED. (ECF #99). The Court finds that the Separation Agreement and Divorce Decree did not prevent Mr. Howlett from selling the Penn Mutual policy, however, there remains a question of fact as to whether Mr. Howlett was competent at the time he executed that transaction. Trial remains set for December 2, 2019. IT IS SO ORDERED.

*[signature]*
DONALD C. NUGENT
United States District Judge

DATED: *September 20, 2019*